IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GERALD TATE,

    Plaintiff,

vs.

                                                  Civ. No. 03-1174 LCS/KBM

JOHN FISH,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's Motion for Summary Judgment, filed on May 19, 2004. (Def's. Mot. Summ. J., Doc. 19). The United States Magistrate Judge, acting upon consent and designation pursuant to 28 U.S.C. § 636, and having considered the record, arguments of counsel, relevant law, and being otherwise fully advised, finds that the Motion should be **GRANTED IN PART** and **DENIED IN PART**.

I. **Background**

The following statement of facts is set forth in the light most favorable to Plaintiff, with all reasonable inferences from the record drawn in his favor. *See Clanton v. Cooper*, 129 F.3d 1147, 1150 (10th Cir. 1997) (citation omitted). This case arises out of a physical altercation between Plaintiff and Defendant, an Animal Control Officer, that occurred on July 24, 2003. (Compl. ¶ 12, Doc. 1; Fish Aff. ¶¶ 3, 23, Def. Ex. A, Doc. 20). Plaintiff and Defendant have known each other for approximately 30 years and their relationship has been strained for approximately the last 17-19 years. (Tate Dep. p. 17, ln 5-16, Def. Ex. E, Doc. 20).

On July 24, 2003, Plaintiff reported a problem with skunks at his residence to Officer Steve Minner. (George Aff. ¶ 12, Def. Ex. B, Doc. 20). Officer Minner relayed the message to Defendant and Defendant drove to Plaintiff's residence in a truck owned by the Village of Capitan in order to inquire about the problem. (Tate Dep. p. 29, ln. 11-15; p. 30, ln. 9-16, Def. Ex. E, Doc. 20). Defendant remained in the truck as he spoke to Plaintiff and Plaintiff indicated that he would take care of the skunk problem on his own and that he did not need Defendant's help. (Tate Dep. p. 31, ln. 2-5, Def. Ex. E, Doc. 20).

Plaintiff started walking away from Defendant's vehicle. (Tate Dep. p. 31, ln. 7, Def. Ex. E, Doc. 20). Defendant then yelled to Plaintiff from the truck regarding a conversation that Plaintiff's wife had had with Defendant several weeks prior to July 24, 2003. (Tate Dep. p. 32, ln. 2-4; p. 34, ln. 4-10, Def. Ex. E, Doc. 20). Plaintiff returned to Defendant's vehicle and noticed a tape recorder placed on Defendant's lap. (Tate Dep. p. 32, ln 2-4; p. 38, ln. 3-6, Def. Ex. E, Doc. 20). Plaintiff reached through the window, attempting to grab the tape recorder so that he could let the city council hear the words exchanged between the parties. (Tate Dep. p. 38, ln. 3-6, Def. Ex. E, Doc. 20). As Plaintiff was reaching through the window, Defendant hit Plaintiff's left arm with a metal baton, or ASP. (Tate Dep. p. 38, ln. 8-18, Def. Ex. E, Doc. 20). Plaintiff pushed Defendant back with his right arm and then backed up from Defendant's vehicle. (Tate Dep. p. 39, ln. 10-12; p. 40, ln. 18-21, Def. Ex. E, Doc. 20).

Defendant jumped out of the vehicle and pursued Plaintiff on his property. (Tate Dep. p. 40, ln 23-25; p. 41, ln. 1-14, Def. Ex. E, Doc. 20). Defendant began swinging his ASP at Plaintiff, striking him three to four times, and he also kicked Plaintiff in the groin. (Tate Dep. p. 42, ln 3-10; p. 43, ln. 7-9, Def. Ex. E, Doc. 20). Plaintiff was hit on the top of his head, on his neck, across his left eye, and

2

on his forehead above his left eye. (Tate Dep. p. 43, ln 12-22, Def. Ex. E, Doc. 20). Plaintiff covered his head with his arms and hands and Defendant hit Plaintiff's elbow with the ASP. (Tate Dep. p. 44, ln 1-6, Def. Ex. E, Doc. 20). Plaintiff began to defend himself and then decided to retreat and walked back to his house. (Tate Dep. p. 42, ln 16-19, Def. Ex. E, Doc. 20). Due to the swelling, Plaintiff had his elbow drained a few days after the altercation. (Tate Dep. p. 47, ln 13-17, Def. Ex. E, Doc. 20). Plaintiff's vision in his left eye is sometimes blurred as a result of the altercation. (Tate Dep. p. 49, ln 5-12; ln18-20, Def. Ex. E, Doc. 20). The Court notes that Defendant's rendition of the incident differs greatly from that of Plaintiff's, but as noted above, the facts are set forth in the light most favorable to Plaintiff, with all reasonable inferences from the record drawn in their favor. *See Clanton*, 129 F.3d at 1150.

Defendant has been an Animal Control Officer for the Village of Capitan since August 30, 1999. (Fish Aff. ¶¶ 3-4, Def. Ex. A, Doc. 20; George Aff. ¶ 5, Def. Ex. B, Doc. 20). Defendant's Job Description is as follows:

> Will have commissioned authority to issue citations whenever there is probable cause to believe that a person has violated the provisions of the Animal Control Ordinance.
> Must be familiar with Animal Control Ordinance. Investigates and reports all animal bites on conformance with regulations promulgated by the Health and Environment Department. Captures and impounds unlicensed, stray and uncontrolled animals. Snares animals with a net, rope, or device and tranquilizes animals, or secures animals in truck. Takes animals to shelter. Primary caretaker of care and cleaning of animal kennels. Must be able to euthanise [sic] animals as required. May have to be available for purposes of trial at any court setting arising out of citations issued pursuant to the Animal Control Act. Must be willing to work evenings or as otherwise directed. (Def. Ex. C, Doc. 20).

Chuck George, who is the Chief of Police for Village of Capitan and Defendant's supervisor stated:

> John Fish is the person who traditionally performs the duties described in the Job Description of an Animal Control Officer for the Village of Capitan. Capitan Police Department

members only involve themselves in animal related matters when John Fish is not available, which is a very rare occasion. If the Capitan Police Department does have to respond to an animal-related call or complaint, they generally explain that the Animal Control Officer is the person who normally handles the situation and will get in contact with them as soon as possible. If there is an emergency situation and John Fish is not available, the Capitan Police Department will handle the matter until John Fish can take over. John Fish does not perform any duties or acts that members of the Capitan Police Department would traditionally perform. (George Aff. ¶¶ 8-9, Def. Ex. B, Doc. 20).

The Job Description for Police Officers in the Village of Capitan does not include any language pertaining to animal-related issues. (Def. Ex. G, Doc. 24).

Plaintiff filed his complaint in the Twelfth Judicial District, Lincoln County, on August 28, 2003 alleging constitutional violations pursuant to 42 U.S.C. § 1983 as well as battery under the New Mexico Tort Claims Act ("Tort Claims Act"). *See* Notice of Removal, Ex. B, Doc. 1. Defendant removed the case to this Court on October 8, 2003. (Notice of Removal, Doc. 1). Defendant filed his Motion for Summary Judgment on May 19, 2004 arguing that 1) no constitutional violation occurred and that he is entitled to qualified immunity and 2) Defendant is not a law enforcement officer under the Tort Claims Act and is entitled to sovereign immunity on the battery count. (Def's. Mot. Summ. J., Doc. 19; Def's Mem. Supp. Summ. J, Doc. 20).

## II.  Standard

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Summary judgment is proper when the pleadings, depositions, answers to interrogatories and admissions on file, as well as any affidavits "show that there is no genuine issue as to any material fact." *Id.* When applying this standard, the Court examines the record and reasonable inferences in the light most favorable to the non-moving party. *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

4

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case. *See Celotex v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter. *See McGarry v. Board of County Comm'rs*, 175 F.3d 1193, 1198-1199 (10th Cir. 1999).

## III.    Analysis

### A.    Qualified Immunity

Under the doctrine of qualified immunity, governmental officials performing discretionary functions generally are shielded from liability for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998). Further, qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Roska v. Peterson*, 328 F.3d 1230, 1239 (10th Cir. 2003) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Due to the purposes behind qualified immunity, the court "reviews summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1311-1312 (10th Cir. 2002) (quoting *Holland v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001)). The Tenth Circuit has

5

noted that "[w]hen a § 1983 defendant raises the defense of qualified immunity on summary judgment, the burden shifts to the plaintiff to show that 1) the official violated a constitutional or statutory right; and 2) the constitutional or statutory right was clearly established when the alleged violation occurred." *Olsen*, 312 F.3d at 1312 (citing *Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002)). If the plaintiff does not satisfy either of the prongs of this test, the court must grant the defendant qualified immunity. *Olsen*, 312 F.3d at 1312 (citing *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001)). If the plaintiff demonstrates that the official violated a clearly established constitutional or statutory right, then the burden shifts back to the defendant, who must demonstrate that no genuine issues of material fact exist and that the defendant is entitled to judgment as a matter of law. *Id.* The defendant, therefore, still bears the summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense. *Olsen*, 312 F.3d at 1312 (citing *Farmer*, 288 F.3d at 1259). Finally, "[w]here the record demonstrates an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be 'properly denied.'" *Olsen*, 312 F.3d at 1312 (quoting *Salmon v. Schwarz*, 948 F.2d 1131, 1136 (10th Cir. 1991)).

a.   **Constitutional Violation**

In his Memorandum in Response to Defendant's Motion for Summary Judgment, Plaintiff alleges that both Plaintiff's Fourth and Fourteenth Amendments were violated under 42 U.S.C. § 1983. Pl's Mem. Supp. Resp. Summ. J. at 12, Doc. 23. However, in my view the Fourth Amendment does not apply. As the Tenth Circuit noted, "Claims that state actors used excessive force - deadly or not - in the course of a seizure are analyzed under the Fourth Amendment's reasonableness standard. Plaintiffs must show both that a seizure occurred and that the seizure was unreasonable. A person is

6

seized within the meaning of the Fourth Amendment when a reasonable person would believe that he or she is not free to leave." *Roska*, 328 F.3d at 1243 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989); *Florida v. Bostick*, 501 U.S. 429, 435 (1991)). There is nothing in the record before the Court that suggests that Plaintiff was not free to leave. In fact the altercation ended upon Plaintiff's retreat; moreover, Plaintiff does not allege that he was seized in his Complaint. *See* Tate Dep. p. 42, ln 16-19, Def. Ex. E, Doc. 20. Further, the Court notes that attorney for Plaintiff, Adam Rafkin, Esq., conceded at the Pre-Trial Conference on September 2, 2004 that the Fourth Amendment does not apply to the instant case.

Because the Fourth Amendment does not apply, this Court must analyze the matter as a violation of substantive due process, as it is the Fourteenth Amendment that provides the appropriate framework "in cases that involve excessive force where a specific constitutional provision – such as the Fourth or Eighth Amendment – does not apply." *Roska*, 328 F.3d at 1243 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998)). Thus, Plaintiff's claim is analyzed under the Fourteenth Amendment, which protects citizens against state actions that deprive them of life, liberty, or property without due process of the law. U.S. CONST. amend. XIV. As the Supreme Court noted in *Daniels*, "[h]istorically, this guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1985).

In determining whether force was excessive within the meaning of the Fourteenth Amendment, the Court must examine three factors: 1) the relationship between the amount of force used and the need presented, 2) the extent of the injury inflicted, and 3) the motives of the state actor. *Roska*, 328 F.3d at 1243 (citing *Hammula v. City of Lakewood*, 907 F.2d 129, 131-132 (10th Cir. 1990)). Further,

7

force inspired by malice or by "unwise, excessive zeal amounting to an abuse of official power that shocks the conscience . . . may be redressed under [the Fourteenth Amendment]." *Roska*, 328 F.3d at 1243 (quoting *Hewitt v. City of Truth or Consequences*, 758 F.2d 1375, 1379 (10th Cir. 1985)).

Examining the factors as set out by the Tenth Circuit and taking the facts most favorable to the non-moving party, I believe Plaintiff has raised a genuine issue of material fact that Defendant has violated his Fourteenth Amendment right by using excessive force. The facts as presented by Plaintiff indicate that Defendant went to Plaintiff's home in order to inquire about a skunk problem and that Plaintiff indicated that he did not need Defendant's help and started to walk away from Defendant's truck. (Tate Dep. p. 31, ln. 2-7, Def. Ex. E, Doc. 20). Plaintiff returned to Defendant's truck when Defendant continued to yell out at him from the driver's seat of his truck and Plaintiff noticed a tape recorder in Defendant's lap. (Tate Dep. p. 33, ln. 1; p. 38, ln. 3-6, Def. Ex. E, Doc. 20). Defendant hit Plaintiff on his left arm with an ASP when Plaintiff reached into Defendant's truck through the open driver's side window to grab the tape recorder and Plaintiff pushed Defendant back with his right arm and then backed up from Defendant's vehicle. (Tate Dep. p. 38, ln. 3-6; ln 8-18; p. 39, ln. 10-12; p. 40, ln. 18-21, Def. Ex. E, Doc. 20). Defendant then jumped out of the vehicle and pursued Plaintiff on his property. (Tate Dep. p. 40, ln 23-25, p. 41, ln. 1-14, Def. Ex. E, Doc. 20). Defendant began swinging his ASP at Plaintiff, striking him three to four times, and he also kicked Plaintiff in the groin. (Tate Dep. p. 42, ln 3-10; p. 43, ln. 7-9, Def. Ex. E, Doc. 20). Plaintiff was hit on the top of his head, on his neck, across his left eye, and on his forehead above his left eye. (Tate Dep. p. 43, ln 12-22, Def. Ex. E, Doc. 20). Plaintiff covered his head with his arms and hands and Defendant hit his elbow with the ASP. (Tate Dep. p. 44, ln 1-6, Def. Ex. E, Doc. 20). Plaintiff began to defend himself by attempting to take Defendant to the ground but Plaintiff then decided to retreat and walked back to

his house. (Tate Dep. p. 42, ln 10-19, Def. Ex. E, Doc. 20). Plaintiff had his elbow drained a few days after the altercation. (Tate Dep. p. 47, ln 13-17, Def. Ex. E, Doc. 20). Plaintiff's vision in his left eye is sometimes blurred and he had never had that problem prior to the incident. (Tate Dep. p. 49, ln 5-12; ln 18-20, Def. Ex. E, Doc. 20). Examining the factors as laid out in *Roska* in a light most favorable to Plaintiff, the need for force is not evident to me, as Plaintiff was only attempting to reach for the tape recorder in Defendant's lap nor was Plaintiff threatening Defendant's safety. *Roska*, 328 F.3d at 1243; Tate Dep. p. 38, ln. 3-6, Def. Ex. E, Doc. 20. Further, Plaintiff appears to have suffered from injuries to his elbow, which required draining, as well as a lasting injury to his eye. (Tate Dep. p. 47, ln 13-17; p. 49, ln 5-12; ln 18-20, Def. Ex. E, Doc. 20). Finally, it is not clear what Defendant's motives were; Defendant and Plaintiff had not been on good terms for quite some time. *See* Tate Dep. p. 17, ln 5-16, Def. Ex. E, Doc. 20. However, that does not justify Defendant's use of force. In fact the personal animosity between the parties makes Defendant's possible motives less justifiable since his relationship with Plaintiff could not be a legitimate driving force behind governmental action. Taking Plaintiff's version of the facts as true, Defendant's acts could "shock the conscience" because "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscious-shocking level" and Defendant's attack on Plaintiff cannot, on the record before me, be justified by any governmental interest. *County of Sacramento v. Lewis*, 523 U.S. at 849. Thus, Plaintiff has demonstrated a violation of his Fourteenth Amendment right and the Court next turns to the issue of whether the constitutional right was clearly established when the alleged violation occurred. *Olsen*, 312 F.3d at 1312 (citing *Farmer*, 288 F.3d at 1259).

9

b.    **Clearly Established Law**

Plaintiff must show that his Fourteenth Amendment right against excessive force was clearly established such that a reasonable person in the defendant's position would have known that his conduct violated that right. *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citation omitted). "If the law at [the time of the incident giving rise to the litigation] was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. As stated in *Roska*, "[t]he law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." *Roska*, 328 F.3d at 1248 (citing *Farmer*, 288 F.3d at 1259). The Court may make a finding that the law is clearly established even if cases involving fundamentally similar facts are not available. *Roska*, 328 F.3d at 1248 (citing *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). As the Tenth Circuit noted, "a requirement of a case directly on point would quickly transform the qualified immunity standard to an absolute immunity standard in the vast majority of cases." *Roska*, 328 F.3d at 1248 (citation omitted).

As the Supreme Court stated in *Saucier*, "[i]n the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). That the due process protection of the Fourteenth Amendment has been historically applied to "deliberate decisions of government officials" helps elucidate that the law is clearly established in this case. *Daniels*, 474 U.S. at 331. More specifically, the concept of "shocking the conscience" was first mentioned by the Supreme Court in 1952 in *Rochin*. *Rochin v.*

10

*California*, 342 U.S. 165, 172 (1952). Since that case the Supreme Court has explained that conscience-shocking behavior that would support a substantive due process claim would be "conduct intended to injure in some way unjustifiable by any government interest." *County of Sacramento v. Lewis*, 523 U.S. at 849. Further, the three-factor test as set out in discussing whether a constitutional violation occurred has been utilized in the Tenth Circuit within the context of the Fourteenth Amendment and excessive force since at least as early as *Hewitt* in 1985. *See Hewitt*, 758 F.2d at 1379. Taking this into consideration, especially that Fourteenth Amendment due process claims are applied to situations of deliberate conduct of government officials who cause injury without a justifiable governmental interest, the Court finds that the law concerning a Fourteenth Amendment due process violation was clearly established such that a reasonable person in Defendant's position would have known that physically injuring someone with a metal baton merely because that person was trying to grab a tape recorder would violate that person's Fourteenth Amendment rights.

Since Plaintiff has demonstrated Defendant violated a clearly established constitutional right, the burden shifts back to the Defendant, who must show that no genuine issues of material fact exist and that the defendant is entitled to judgment as a matter of law. *Olsen*, 312 F.3d at 1312 (citing *Pirtle*, 245 F.3d at 1156). The court has viewed the facts in the light most favorable to Plaintiff; however, the facts as set forth by Plaintiff are not undisputed, in fact they are hotly contested. Defendant's version of the material facts are virtually the opposite of Plaintiff's. *See* Fish Aff., Def. Ex. A, Doc. 20; Fish Dep., Def Ex. D, Doc. 20. Since the record demonstrates an unresolved dispute of relevant fact, Defendant's motion for summary judgment based on qualified immunity is denied.

### B.     New Mexico Tort Claims Act

Plaintiff alleges that Defendant committed a battery under the New Mexico Tort Claims Act ("Tort Claims Act"), NMSA § 41-4-1 *et seq.*, and that Defendant's immunity was waived under the Act. (Notice of Removal, Ex. B ¶ 21, Doc. 1). Pursuant to 28 U.S.C. § 1367(a), I will exercise supplemental jurisdiction over Plaintiff's state law claim. 28 U.S.C. § 1367(a) (2004).

The Tort Claims Act does not provide a waiver of immunity for intentional torts with regard to public employees. NMSA § 41-4-1 *et seq.* (1978 Comp.).[1] Plaintiff contends that Defendant's immunity was waived by § 41-4-12, which provides a waiver of immunity for enumerated torts committed by law enforcement officers. NMSA § 41-4-12 (1978 Comp.).[2] Further, the Act defines a law enforcement officer as a "full-time salaried public employee of a governmental entity whose principal duties under the law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes. . ." NMSA § 41-4-3(D) (1978 Comp.). Thus, the issue is whether Defendant, an animal control officer, is a law enforcement officer within the meaning of the Act. If he is not, he is entitled to the immunity for public employees and summary judgment on this claim will be granted in his favor. If he is a law enforcement officer, immunity does not apply and summary judgment will not be granted on this claim.

---

[1] "A governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived by . . . Sections 41-4-5 through 41-4-12 NMSA 1978." NMSA § 41-4-4(A) (1978 Comp.).

[2] "The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties." NMSA 41-4-12 (1978 Comp.).

Plaintiff does not allege that Defendant as an animal control officer could hold in custody any person accused of a criminal offense or make arrests as would law enforcement officers. *See* NMSA § 41-4-3(D) (1978 Comp.). The question then is whether Plaintiff is a law enforcement officer because he "maintained public order." *Id.* The New Mexico Court of Appeals outlined the test for determining whether an animal control officer is a law enforcement officer. *Baptiste v. City of Las Cruces*, 115 N.M. 178 (N.M. Ct. App. 1993). According to *Baptiste*, an animal control officer "is a 'law enforcement officer' only if the majority of the [animal control officer's] time is devoted to the duties of maintaining public order." *Id.* at 181. "Second, insofar as a duty of an [animal control officer] involves maintaining public order, is the duty one traditionally performed by law enforcement officers? If the duty is not a traditional duty of law enforcement officers, it does not come within the meaning of 'maintaining public order' in the statutory definition of 'law enforcement officer.'" *Id.* In short, in order to be a law enforcement officer within the statute Defendant 1) must maintain public order, meaning he must perform a traditional duty of law enforcement officers and 2) the majority of Defendant's time must be devoted to duties of maintaining public order. *Id.*

Defendant began his employment as Animal Control Officer for the Village of Capitan on August 30, 1999. (Fish Aff. ¶¶ 3-4, Def. Ex. A, Doc. 20; George Aff. ¶ 5, Def. Ex. B, Doc. 20). Defendant's Job Description is as follows:

> Will have commissioned authority to issue citations whenever there is probable cause to believe that a person has violated the provisions of the Animal Control Ordinance.
> Must be familiar with Animal Control Ordinance. Investigates and reports all animal bites on conformance with regulations promulgated by the Health and Environment Department. Captures and impounds unlicensed, stray and uncontrolled animals. Snares animals with a net, rope, or device and tranquilizes animals, or secures animals in truck. Takes animals to shelter. Primary caretaker of care and cleaning of animal kennels. Must be able to euthanise [sic] animals as required. May have to be available for purposes of trial at any court setting arising out of citations issued pursuant to the Animal Control Act. Must be willing to work evenings or as otherwise directed. (Def. Ex. C, Doc. 20).

Chuck George is the Chief of Police for the Village of Capitan, and is also Defendant's supervisor. (George Aff. ¶¶ 2, 4, Def. Ex. B, Doc. 20). In his Affidavit, Mr. George stated that members of the Capitan Police Department ("CPD") only get involved in animal-related matters when Defendant is not available, "which is a very rare occasion." (George Aff. ¶ 8, Def. Ex B, Doc. 20). Further, if the CPD does respond to an animal-related matter, they generally explain that the Animal Control Officer handles such matters and that he will take care of it as soon as possible. *Id.* The CPD does not "traditionally pick up dead animals, take care of injured animals, inspect licenses, or enforce the Animal Control Ordinance or other laws regarding the treatment of animals" nor do they "traditionally respond to complaints for barking dogs or biting animals." (George Aff. ¶ 11, Def. Ex. B, Doc. 20). If Defendant is not available and there is an emergency situation, the CPD will handle the matter only until Defendant can take over. (George Aff. ¶ 8, Def. Ex. B, Doc. 20). Mr. George also indicated that Defendant does not perform any duties that members of the CPD would traditionally perform. (George Aff. ¶ 9, Def. Ex. B, Doc. 20). Finally, an inspection of the job description for police officers in the Village of Capitan does not include any language pertaining to animal-related issues. (Def. Ex. G, Doc. 24).

Applying the test as formulated in *Baptiste* to the record before me, Defendant is not a law enforcement officer and is entitled to immunity since he does not "maintain public order" for the majority of his time. *Baptiste*, 115 N.M. at 181. As Mr. George indicated in his affidavit, members of the CPD do not get involved with animal-related issues. (George Aff. ¶¶ 8, 11, Def. Ex. B, Doc. 20). The CPD only gets involved in animal-related matters when Defendant is not available, which is very rare. *Id.* Further, the job description for officers in the CPD does not include any language that resembles Defendant's Job Description as an Animal Control Officer. (Def. Ex. G, Doc. 24).

Thus, the CPD does not traditionally perform duties as outlined in Defendant's Job Description, and as Mr. George and Defendant's Job Description indicate, Plaintiff does not perform duties that members of the CPD traditionally perform, such as holding a person in custody who is accused of a criminal offense and does not have the ability to make arrests for crimes. (George Aff. ¶¶ 9-10, Def. Ex. B, Doc. 20; Def. Ex. C, Doc. 20). Plaintiff has filed no affidavit nor pointed to any portion of the record that would create a genuine issue of material fact with regard to whether Defendant is a law enforcement officer who would, thus, not be entitled to immunity.[3] Given these undisputed facts, Defendant does not "maintain public order," meaning he does not perform a traditional duty of law enforcement officers and as such he clearly cannot spend a majority of his time "maintaining public order." *See Baptiste*, 115 N.M. at 181. Thus, Defendant, an Animal Control Officer in Capitan, is not a law enforcement officer under the Act and is entitled to sovereign immunity on Plaintiff's count of battery in violation of the Tort Claims Act. As such, Defendant's motion for summary judgment on this count must be granted.

## IV. Conclusion

Upon review of the evidence presented on Defendant's Motion for Summary Judgment, this Court has determined that Defendant's Motion for Summary Judgment based on qualified immunity on Plaintff's count of constitutional violation pursuant to 42 U.S.C. § 1983 is **DENIED** and

---

[3] In his Response to Defendant's Motion for Summary Judgment, Plaintiff asserts that "a law enforcement officer's traditional duties within the context of maintaining public order, are to respond to animal related complaints." Pl's. Mem. Supp. Resp. Mot. Summ. J. at 9, Doc. 23. In support of this assertion, Plaintiff does not point to the job description of police officers of Capitan; rather, he introduces exhibits of job descriptions for police officers in jurisdictions other than Capitan. *See* Pl. Ex. C1-C3, Doc. 23. These exhibits are wholly irrelevant and do not have any impact upon the traditional duties of a Capitan police officer. Further, Plaintiff states, "Defendant's Affidavit, and that of Police Chief Chuck George, establish that in Capitan, dealing with complaints regarding animals is something traditionally handled by the police." Pl's. Mem. Supp. Resp. Mot. Summ. J. at 8, Doc. 23. Given the record before me, I find no support for Plaintiff's conlcusory assertion.

15

Defendant's Motion for Summary Judgment on Plaintiff's count of battery under the New Mexico Tort Claims Act is **GRANTED**.

**IT IS SO ORDERED.**

_____
LESLIE C. SMITH
**UNITED STATES MAGISTRATE JUDGE**